U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2026 SEP 30 A 9:12

CLERK
BY [signature] DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| MYRKEL STALEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:23-cv-00067 |
| | ) | |
| ZELTIQ AESTHETICS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO FILE AMENDED COMPLAINT**
(Doc. 71)

On March 3, 2023, Plaintiff Myrkel Staley brought this action against Zeltiq Aesthetics, Inc., ("Zeltiq"), for injuries arising from his use of Zeltiq's CoolSculpting System, alleging strict product liability, negligence, breach of express and implied warranties, fraudulent concealment, negligent misrepresentation, and violation of the Vermont Consumer Protection Act, 9 V.S.A. § 2453(a). A Scheduling Order entered on May 26, 2023 set a deadline of July 21, 2023 to amend pleadings. (Doc. 20.)[1] On July 13, 2026, citing recent discovery production, Plaintiff moved for leave to amend his initial complaint (the "Complaint"), (Doc. 7), to add a count for punitive damages. (Doc. 71.) Zeltiq filed its opposition on July 27, 2026, (Doc. 80), and Plaintiff replied on August 5, 2026, (Doc. 88), at which time the court took the pending motion under advisement.

Plaintiff is represented by Stephanie M. Greenlees, Esq., and Robert J. Kaplan, Esq. Zeltiq is represented by David M. Cohen, Esq., Emily D. Amrhein, Esq., James M. Campbell, Esq., Kathleen M. Guilfoyle, Esq., Matthew S. Borick, Esq., Orlando R. Richmond, Sr., Esq., Raquel Lucas Herraiz, Esq., and William M. Plosser, Esq.

---

[1] This action is on its Fifth Amended Discovery Schedule and Order. (Doc. 70.) The deadline to amend pleadings remained unchanged in subsequent modifications to the discovery schedule.

## I. Factual Background.

### A. Allegations in the Complaint.

Zeltiq designs and manufactures the CoolSculpting System, which is "used on individuals to induce lipolysis, the breaking down of fat cells in the body." (Doc. 7 at 1, ¶ 3.) Plaintiff went to Bare Medical Spa in Burlington, Vermont, on February 24, 2020, "to inquire about undergoing CoolSculpting treatment. After discussing the CoolSculpting procedure with sales personnel at the [s]pa, he was advised that he was a good candidate for the procedure." *Id.* at 7-8, ¶ 32.

On March 5, 2020, Plaintiff underwent the CoolSculpting procedure, and on March 22, 2020, he "developed a firm and lumpy mass" in the abdominal area where he received the CoolSculpting treatment." *Id.* at 9, ¶ 37. On September 10, 2020, "a surgical doctor diagnosed [Plaintiff] with Paradoxical Adipose Hyperplasia [("PAH")] resulting from the CoolSculpting procedure and, on September 25, 2020, he underwent corrective liposuction surgery to remove the masses." *Id.* at ¶ 38.

### B. Allegations in the Proposed Amended Complaint.

In his proposed Amended Complaint (the "Amended Complaint"), Plaintiff alleges additional facts regarding Zeltiq's knowledge of the risk of PAH from CoolSculpting, including a claim that Zeltiq artificially lowered the reported incidence rate and mischaracterized the frequency category of PAH. Plaintiff avers that, despite knowing that PAH was a "serious adverse event because it results in permanent impairment of a body structure[,]" Zeltiq's clinical trials "were not designed to capture cases of PAH[.]" (Doc. 71-6 at 5, ¶ 22) (internal quotation marks omitted). According to Plaintiff, Zeltiq knew its clinical trials were "too short to detect PAH cases in trial subjects and, thus, knew its clinical trials did not and could not accurately evaluate the safety of the Cool[S]culpting device." *Id.*

Plaintiff further alleges that Zeltiq calculated PAH's incidence rate "based on total patient PAH complaints received and confirmed by it and total cycles shipped[,]" *id.* at 8, ¶ 31, where a "cycle is an authorization to perform one procedure to one specific area on the body." *Id.* at 4, ¶ 15. Plaintiff contends that this "hybrid method of calculating the rate

of PAH, in using a numerator (total patient complaints received) that does not correspond with the denominator (total cycles shipped), is scientifically invalid and artificially lowered the rate of PAH by a significant degree." *Id.* at 8, ¶ 31. Plaintiff also asserts that Zeltiq knew this rate was inaccurate and that an accurate rate must be calculated on a cycle-basis and adjusted for cycles that have not yet been used or were never delivered to a patient. Despite this knowledge, Zeltiq allegedly communicated the hybrid rate to the Food and Drug Administration ("FDA"), providers, and consumers. Plaintiff claims that, because Zeltiq miscalculated the PAH incidence rate, it misrepresented PAH as a "rare" rather than "uncommon" side effect to producers and consumers. *Id.* at 9, ¶¶ 33-34 (internal quotation marks omitted).

Plaintiff asserts that, prior to April 2013, Zeltiq was required to report all PAH events through the FDA's Medical Device Report ("MDR") reporting system. In April 2013, Zeltiq stopped reporting PAH events to the FDA after an FDA auditor allegedly told it that PAH did not meet MDR reporting criteria. According to Plaintiff, "[i]n 2015, 2019[,] and January 2020, Zeltiq received FDA guidance and/or instruction that PAH is an MDR reportable serious injury event" but "did not comply with this guidance and instruction (and its MDR reporting requirements) until 2021[.]" (Doc. 71-6 at 11, ¶ 40.) "As a direct consequence of Zeltiq's noncompliance, Cool[S]culpting providers, including Bare Medical Spa, had no visibility [from FDA data] of the true frequency of PAH events and, in turn, could not independently assess the clinical risk of PAH from Cool[S]culpting." *Id.*

Based on these new allegations, Plaintiff seeks punitive damages, alleging that Zeltiq's "acts and omissions" were "outrageously reprehensible, knowing[,] and intentional[]" as well as "willful and malicious, intentionally deceptive and fraudulent, and manifested a conscious disregard for the safety of others[.]" *Id.* at 27, ¶ 123-24.

## II. Conclusions of Law and Analysis.

### A. Standard of Review.

Pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), "[a] party may amend its pleading once as a matter of course no later than. . . [twenty-one] days after service of a

responsive pleading or [twenty-one] days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." If more than twenty-one days have elapsed, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Under Rule 15(a)(2), "[t]he court should freely give leave when justice so requires[,]" *id.*, and "it is rare that such leave should be denied, especially when there has been no prior amendment." *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) (internal citation omitted).

"Where, as here, a scheduling order governs amendments to the complaint, . . . the lenient standard under Rule 15(a) . . . must be balanced against the requirement under Rule 16(b) that the [c]ourt's scheduling order shall not be modified except upon a showing of good cause." *Holmes v. Grubman*, 568 F.3d 329, 334-35 (2d Cir. 2009) (internal quotation marks and citations omitted); *see also Pristine Jewelers NY, Inc. v. Broner*, 492 F. Supp. 3d 130, 131 (S.D.N.Y. 2020) ("When a party files a motion to amend after the pleading deadline set forth in the case management plan and scheduling order, Fed. R. Civ. P. 16(b) governs and the party must establish 'good cause' to amend its pleadings.") (citation omitted). "A finding of good cause depends on the diligence of the moving party." *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003) (citation omitted); *see also Wells Fargo Bank, N.A. v. United States Life Ins. Co.*, 2026 WL 1002377, at *2 (S.D.N.Y. Apr. 14, 2026) ("Rule 16 does not define 'good cause,' but the Second Circuit has stated that 'the diligence of the moving party' is at the center of the analysis.") (citation omitted).

"[T]o satisfy the good cause standard[,] the party must show that, despite [] having exercised diligence, the applicable deadline could not have been reasonably met." *Wells Fargo Bank, N.A.*, 2026 WL 1002377, at *2 (internal quotation marks omitted) (quoting *Saray Dokum ve Madeni Aksam Sanayi Turizm A.S. v. MTS Logistics Inc.*, 335 F.R.D. 50, 52 (S.D.N.Y. 2020)); *see also Cardew v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 743 F. Supp. 3d 523, 527 (W.D.N.Y. 2024) ("In other words, 'good cause exists where the moving party is unable to comply with a required deadline despite the exercise of due diligence.'") (alteration adopted) (citation omitted). "A party cannot, therefore,

demonstrate diligence where . . . the proposed amendment is based on information that the party 'knew, or should have known, in advance of the deadline.'" *Morant v. City of New Haven*, 731 F. Supp. 3d 358, 362 (D. Conn. 2024) (citation omitted). "Even if good cause is established, however, a court may deny a motion to amend if the proposed amendment would be futile, unduly prejudicial, or otherwise improper." *Pristine Jewelers NY*, 492 F. Supp. 3d at 131-32 (internal quotation marks and citations omitted).

**B. Whether Plaintiff Has Demonstrated "Good Cause."**

Plaintiff argues that good cause exists to amend his Complaint because the new allegations and claim for punitive damages are based on recent supplemental initial disclosures dated May 7, 2026 that revealed the following:

- An internal log of PAH complaints received by Zeltiq between 2015 and 2020 (produced October 13, 2025);
- FDA correspondence to Zeltiq dated June 10, 2019 requesting information on the "observed frequency and severity for . . . reported [PAH] event[s]" and whether PAH is "occurring with greater or lesser frequency and/or severity[] than is stated in the labeling[,]"[] and a list of MDRs for PAH events over the past [two] years, as well as providing guidance on MDR submissions;
- Zeltiq's August 5, 2019 response to the FDA reporting a[n] . . . incidence rate of PAH based on . . . complaints received and "[] revenue treatment cycles shipped" between August 2017 and July 2019;
- FDA correspondence dated January 16, 2020 advising Zeltiq that [PAH] is "considered [an] MDR-reportable serious injury event[], as defined in 21 CFR 803.3" and directing Zeltiq to submit "an individual MDR for each event of [PAH] . . . [it] is aware of [in] accordance with 21 CFR 803.50 within 30 days"; and
- Zeltiq's January 27, 2020 response to the FDA stating, among other things, that the rate reported in its August 5, 2019 response . . . was "not accurate" and reporting an "updated accurate inciden[ce] rate" . . . based on . . . complaints received and "[] treatment cycles shipped" between August 2017 and July 2019.

(Doc. 71 at 7). The correspondence between the FDA and Zeltiq was produced for the first time in Defendant's May 7, 2026 supplementation of Zeltiq's Initial Disclosures served June 8, 2023. Plaintiff claims that the May 12, 2026 testimony of Zeltiq's Fed. R.

Civ. P. 30(b)(6) designee, Bryan McMahon, and the June 4, 2026 report of his expert witness, Lei Li, Ph.D., provided further information regarding these events. Without this testimony, Plaintiff alleges the "scientifically invalid calculation to artificially deflate the rate of PAH that [Zeltiq] reported" could not be discerned. *Id.* at 11. Plaintiff took the Fed. R. Civ. P. 30(b)(6) deposition in accordance with the Scheduling Order. He claims he could not have moved to amend previously without Zeltiq's belated document production and the McMahon and Li depositions.

In contrast, Zeltiq claims that Plaintiff possessed the relevant information supporting his new allegations "for many months" and much of it by November 2024. (Doc. 80 at 4). It further argues that "Plaintiff's decision to postpone Rule 30(b)(6) discovery until the eve of the close of fact discovery does not demonstrate diligence or establish good cause." *Id.* at 6.

"The moving party may demonstrate 'good cause' by moving to amend promptly after the discovery of new evidence following the scheduling deadline." *Marseet v. Rochester Inst. of Tech.*, 2023 WL 2377122, at *3 (W.D.N.Y. Jan. 27, 2023). However, "where the substance of the proposed amendment was known to the movant earlier in the proceedings, but the movant nevertheless failed to act, courts have denied leave to amend under Rule 16." *Id.* (alteration adopted) (internal quotation marks, alteration, and citation omitted). "Thus, a party who inexcusably delays after determining that he wishes to allege new claims, whether by discovering new evidence or otherwise, will not satisfy the good cause standard." *Id*; *see, e.g.*, *Volunteer Fire Ass'n of Tappan, Inc. v. Cnty. of Rockland*, 2010 WL 4968247, at *4 (S.D.N.Y. Nov. 24, 2010) (finding no good cause where plaintiff failed to move to amend complaint until four months after advising court that it wished to do so); *Lawrence v. Town of Cheektowaga*, 2006 WL 2000124, at *3 (W.D.N.Y. July 17, 2006) (denying motion to amend because it was filed nearly one year after plaintiff obtained information giving rise to requested amendment).

Plaintiff's pending motion was filed approximately three years after the deadline for amendment of pleadings expired. The proposed amendments, however, are based on information that was not previously available. The documents disclosed in November

2024 allegedly did not accurately describe the method Zeltiq used to calculate the PAH incidence rate between 2017 and 2020. Plaintiff's new allegations are premised on Zeltiq's allegedly "invalid hybrid calculation" dividing patient-level complaints by treatment cycles shipped (Doc 71 at 5). That calculation was not provided to Plaintiff until Mr. McMahon's testimony on May 12, 2026. It was not until Mr. McMahon's testimony that Plaintiff learned Zeltiq allegedly knew that its clinical trials were not designed adequately to detect PAH cases.

Plaintiff moved for leave to amend and filed the pending motion approximately two months after the disclosure of this new information. *See, e.g.*, *Soroof Trading Dev. Co., Ltd. v. GE Microgen, Inc.*, 283 F.R.D. 142, 149 (S.D.N.Y. 2012) (finding that plaintiff moved diligently in seeking leave to amend two months after new facts were learned at deposition); *Vanguard Dealer Servs., LLC v. Bottom Line Driven, LLC*, 2022 WL 1239951, at *3 (D. Conn. Apr. 27, 2022) (holding plaintiff moved diligently in seeking leave to amend "just over two months after it became aware of the bases for its proposed amendment[]"). In light of Zeltiq's late-produced discovery, Plaintiff has established his diligence in seeking leave to amend.

### C. Whether Amendment Is Unduly Prejudicial.

"Undue prejudice arises when an 'amendment comes on the eve of trial and would result in new problems of proof.'" *Ruotolo v. City of New York*, 514 F.3d 184, 192 (2d Cir. 2008) (alteration adopted) (quoting *State Tchrs. Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981)); *see also AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725-26 (2d Cir. 2010) ("Amendment may be prejudicial when . . . it would require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute.") (internal quotation marks and citation omitted). "The degree of potential prejudice a motion to amend may cause is evaluated against the overall progress of the litigation: the closer to the end of discovery or the closer to trial a motion to amend is filed, the more likely that it will cause prejudice and delay to the nonmoving party." *Mohegan Lake Motors, Inc. v. Maoli*, 2018 WL 4278352, at *5 (S.D.N.Y. June 8, 2018) (citing *GEM*

*Glob. Yield Fund, Ltd. v. Surgilight, Inc.*, 2006 WL 2389345, at *11 (S.D.N.Y. Aug. 17, 2006)).

Plaintiff argues that amendment will not prejudice Zeltiq because the proposed amendments are not materially different "in substance from existing claims . . . that Zeltiq misrepresented, concealed[,] and failed to warn of the true risk and incidence of PAH[,]" and merely add allegations of "specific, aggravating factors that form the basis for punitive damages[.]" (Doc. 71 at 11.) Zeltiq counters that amendment will require re-opening fact discovery, particularly regarding Zeltiq's regulatory communications with the FDA. However, Zeltiq presumably has possession, custody, and control of those communications, and Plaintiff does not seek them by way of additional written discovery or depositions. In any event, "[a]s most amendments entail additional discovery and some delay, those factors alone do not give rise to prejudice." *AT&T Corp. v. Atos IT Sols. & Servs., Inc.*, 714 F. Supp. 3d 310, 341 (S.D.N.Y. 2024); *see also Bridgeport Music, Inc. v. Universal Music Grp., Inc.*, 248 F.R.D. 408, 414 (S.D.N.Y. 2008) ("Even assuming that additional discovery would impose costs on . . . the current defendants, allegations that an amendment will require the expenditure of some additional time, effort, or money do not constitute undue prejudice.") (alteration adopted) (internal quotation marks and citation omitted).

Fact discovery closed approximately five months ago. Zeltiq nevertheless continues to produce supplemental discovery, including most recently on July 17, 2026.[2] The Fifth Amended Discovery Schedule and Order sets a trial-ready date of February 15, 2027. Against this backdrop, Zeltiq would not be required to expend significant additional resources to conduct discovery related to Plaintiff's new allegations, and amendment of Plaintiff's claims will not pose undue prejudice to Zeltiq.

---

[2] Plaintiff avers that "material written/documentary discovery and [Rule] 30(b)(6) testimony by [Zeltiq] is still outstanding and will be the subject of [his] forthcoming motion to compel." (Doc. 88 at 5.)

### D. Whether Amendment Is Futile.

"[I]t is well established that leave to amend a complaint need not be granted when amendment would be futile." *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003). "A proposed amendment to a complaint is futile when it 'could not withstand a motion to dismiss.'" *Balintulo v. Ford Motor Co.*, 796 F.3d 160, 164-65 (2d Cir. 2015) (quoting *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002)). To survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, a plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The sufficiency of a proposed amendment is evaluated using a "two-pronged approach[.]" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 679). First, the court discounts legal conclusions or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.*

The court does not "weigh the evidence" or "evaluate the likelihood" that a plaintiff's claims will prevail. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017); *see also Kardovich v. Pfizer, Inc.*, 97 F. Supp. 3d 131, 140 (E.D.N.Y. 2015) ("[I]ssues of fact, credibility, and the weight of the evidence are not properly considered on a motion to dismiss[.]"). Instead, it determines whether Plaintiffs have "nudged their claims across the line from conceivable to plausible[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). The burden is on the party opposing the amendment to establish futility. *See Contrera v. Langer*, 314 F. Supp. 3d 562, 567 (S.D.N.Y. 2018) ("[T]he party opposing the amendment bears the burden of showing . . . futility of the amendment.") (internal quotation marks and citation omitted).

According to Zeltiq, Plaintiff's proposed amendments are futile because "a disputed statistical methodology does not itself support an inference that Zeltiq acted with a malicious motive or with knowledge that harm was substantially certain to result[]" such that punitive damages are recoverable. (Doc. 80 at 9.) Plaintiff argues that the proposed allegations support punitive damages because they demonstrate that Zeltiq "knowingly and materially understated the risk of" PAH and thereby "acted with bad motive and willful or wanton disregard for the rights and safety of others." (Doc. 88 at 7.)

"In Vermont, punitive damages are reserved for especially egregious conduct, and thus the party seeking them must overcome a very high standard of proof." *Beaudoin on Behalf of New England Expedition Ltd. P'ship II v. Feldman*, 2018 VT 83, ¶ 18, 208 Vt. 169, 178, 196 A.3d 768, 776 (alteration adopted). "An award of punitive damages requires a showing of two essential elements – wrongful conduct that is outrageously reprehensible and malice, defined variously as bad motive, ill will, personal spite or hatred, reckless disregard, and the like." *Id.* (internal quotation marks omitted). "[S]uch conduct need not only be wrongful, but truly reprehensible" and "the defendant must have acted with malice, [which requires] some showing of bad motive." *Fly Fish Vermont, Inc. v. Chapin Hill Ests., Inc.*, 2010 VT 33, ¶ 19, 187 Vt. 541, 549, 996 A.2d 1167, 1174 (internal quotation marks omitted).

"To demonstrate the malice necessary to establish liability for punitive damages, one must show 'conduct manifesting personal ill will or carried out under circumstances evidencing insult or oppression, or even by conduct showing a reckless or wanton disregard of one's rights.'" *DeYoung v. Ruggiero*, 2009 VT 9, ¶ 24, 185 Vt. 267, 278, 971 A.2d 627, 635 (quoting *Brueckner v. Norwich Univ.*, 730 A.2d 1086, 1095 (Vt. 1999)).

In this case, Plaintiff has alleged that Zeltiq intentionally failed to monitor PAH and substantially underreported it and that the "rate reported by [Zeltiq] on January 27, 2020 is . . . [one-twenty-fifth] the clinically relevant, lower bound per-patient rate yielded from its own internal data." (Doc. 88 at 7.) The order of magnitude between the reported and alleged true incidence rates is large because the rates at issue are less than half a percentage point. Assuming Zeltiq deliberately depressed the reported PAH incidence

rate, it is not clear the difference in reported rates nor that the representation of the risk category of PAH as "rare" rather than "uncommon" amounts to "a reckless or wanton disregard of one's rights." (Doc. 88 at 7) (internal quotation marks omitted); *DeYoung*, 2009 VT 9, ¶ 24, 185 Vt. at 278, 971 A.2d at 635 (internal quotation marks and citation omitted).

At least one court has found, however, that a failure to adequately design and conduct clinical trials to test for known risks can constitute a willful and wanton disregard of the safety of other people. In *Nicholson v. Biomet, Inc.*, the Eighth Circuit upheld a punitive damages award upon finding it was "reasonable to conclude that, despite known dangers of past metal-on-metal designs and advisement to conduct testing before releasing the M2a Magnum device, Biomet willfully and wantonly disregarded other people[']s[] safety by not conducting long-term clinical trials to monitor the [known risk]" and that "[a] reasonable jury could conclude that Biomet designed the M2a Magnum with a willful or wanton disregard for the safety of others." 46 F.4th 757, 770 (8th Cir. 2022). Like *Nicholson*, Plaintiff alleges that Zeltiq was aware that PAH was a risk of CoolSculpting and could present three to sixteen months after treatment but it designed clinical trials with insufficient durations of eight to sixteen weeks to avoid disclosing those adverse consequences. If proven, a reasonable jury could conclude that Zeltiq tested and marketed CoolSculpting with a willful or wanton disregard for the safety of consumers.[3]

Zeltiq alternatively asserts that Plaintiff's proposed amendments are futile because there is no nexus between its alleged conduct and the specific harm suffered by Plaintiff, arguing that "there is no evidence . . . that [a] different warning about P[A]H . . . would have caused Plaintiff's healthcare providers not to prescribe CoolSculpting for Plaintiff."

---

[3] The Eleventh Circuit's finding in *Cates v. Zeltiq Aesthetics, Inc.* that Zeltiq's warnings were "accurate, clear, and unambiguous" in describing PAH to healthcare providers does not alter this conclusion because in *Cates*, the plaintiff alleged that the warnings were inaccurate in describing PAH, whereas in this case, Plaintiff alleges that the stated risk was knowingly, intentionally, and materially false. 73 F.4th 1342, 1346 (11th Cir. 2023)

(Doc. 80 at 10.) Plaintiff alleges in his proposed Amended Complaint, however, that he relied on Zeltiq's representations regarding the safety and efficacy of CoolSculpting in making his decision and that "but for Zeltiq's fraudulent concealment and material omissions, he would not have purchased and undergone CoolSculpting treatment." (Doc. 71-6 at 24, ¶ 104.) Accordingly, Plaintiff has plausibly pled a nexus between Zeltiq's alleged conduct and his alleged harm. His proposed amendments are therefore not futile.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for leave to file an amended complaint is GRANTED. (Doc. 71.) Plaintiff must file and serve his proposed Amended Complaint within fourteen (14) days of the date of this Opinion and Order consistent with the Federal Rules of Civil Procedure and this court's Local Rules.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 30th day of September, 2026.

Christina Reiss, Chief Judge
United States District Court